IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| MOBILE COUNTY WATER, SEWER ) | |
| AND FIRE PROTECTION AUTHORITY, ) | |
| INC., ) | |
|             ) | |
|      Plaintiff, ) | |
|             ) | |
| v.          ) | CIVIL ACTION 07-0357-WS-M |
|             ) | |
| MOBILE AREA WATER AND SEWER ) | |
| SYSTEM, INC., ) | |
|             ) | |
|      Defendant. ) | |

**ORDER**

This matter comes before the Court on plaintiff's Application for Temporary Restraining Order (doc. 25), which was filed on October 18, 2007. Following an expedited briefing schedule, that Application is ripe for disposition at this time.[1]

**I.    Background.**

This action is part of a longstanding war on multiple fronts being waged between plaintiff, Mobile County Water, Sewer and Fire Protection Authority ("MCWSFPA"), and defendant, Mobile Area Water and Sewer System ("MAWSS"). The dispute originates from the fact that these Alabama public corporations have developed partially overlapping service territories, inasmuch as both MAWSS and MCWSFPA provide water and sewer services to certain rural customers outside the City of Mobile but within Mobile County. The problem, as plaintiff postures it, is that MAWSS provides the only source of "centralized" sewer services for customers in MCWSFPA's service area. MCWSFPA, for practical and economic reasons,

---

[1] At the close of briefing, plaintiff filed a second, largely redundant motion, styled "Plaintiff's Motion for Issuance of a Preliminary Injunction" (doc. 32). Given the identity of legal standards for temporary restraining orders and preliminary injunctions, such requests are almost always combined in a single motion. For reasons that are unclear, plaintiff elected to file them separated by several days, resulting in complications to the briefing process, as discussed herein. In any event, that Motion is also ripe for disposition.

cannot develop its own competing centralized sewer system. According to plaintiff, MAWSS has parlayed its centralized sewer services into a formidable competitive advantage in the parties' shared service area by instituting an "all-or-nothing" policy pursuant to which residential or commercial customers who wish to avail themselves of MAWSS centralized sewer services must also purchase its water services, thereby depriving the customer of the chance to purchase competing water services from MCWSFPA while purchasing sewer services from MAWSS. The effect, according to plaintiff, is that MCWSFPA is being squeezed out of its own service territory because customers are being coerced to purchase water services from MAWSS when they otherwise might have purchased water from MCWSFPA. Notably, this practice is not new; to the contrary, MCWSFPA repeatedly makes statements in its filings to the effect that "for a number of years, MAWSS has adhered to an all-or-nothing utility policy." (Amended Complaint (doc. 6), ¶ 15; Plaintiff's Brief (doc. 28), ¶ 39.)

Court documents reflect that the disagreements between these two public utility providers concerning how they may compete in their common service territory date back more than two decades, as the parties first engaged in litigation in state court concerning the manner and scope of their competition back in 1986. After an apparent period of armistice, in August 2005, MCWSFPA filed suit against MAWSS in the Circuit Court of Mobile County, Alabama, contending that MAWSS is unlawfully encroaching upon MCWSFPA's exclusive service area by extending its services within that area. MCWSFPA seeks monetary, declaratory and injunctive relief in that action under a variety of state-law statutory and common-law theories. The state court action remains pending today.

Nearly two years later, on May 18, 2007, MCWSFPA initiated another lawsuit against MAWSS by filing a Complaint (doc. 1) in this District Court. This action unquestionably bears factual similarities to, and arises from similar events as, its state court counterpart. Here, MCWSFPA's causes of action are confined to antitrust claims, as MCWSFPA alleges that MAWSS is in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2, as well as a claim under a state statute that creates a right of action for one "injured or damaged by an unlawful trust, combine or monopoly, or its effect, direct or indirect." Ala. Code § 6-5-60(a). The gist of the alleged unlawful conduct on which this action is predicated is MAWSS's practice of "tying" the purchase of water service to the purchase of sewer service. The alleged tying

conduct consists of the all-or-nothing policy described above, thereby leveraging MAWSS's dominance in the sewer service market to oblige its sewer customers also to purchase water service from it, rather than from competitors such as MCWSFPA.  Thus, plaintiff contends that MAWSS is engaged in an illegal tying scheme, in violation of federal antitrust laws, and is abusing its market power in the area of sewer service to gain an unfair competitive advantage in the sale of water service, all to MCWSFPA's detriment.  In this action, MCWSFPA does not seek monetary damages; rather, the *ad damnum* clause of the Amended Complaint is confined to requests for permanent injunctive relief, plus costs and attorney's fees.

In the five months since its filing, this action has proceeded along a routine litigation trajectory.  Magistrate Judge Milling entered a Rule 16(b) Scheduling Order (doc. 19) on September 6, 2007, setting guidelines and deadlines for discovery, pretrial conference and trial, among others.  The case proceeded smoothly until October 18, 2007, when without warning plaintiff abruptly filed an Application for Temporary Restraining Order, with a supporting affidavit and exhibits.  The catalyst for that filing, and MCWSFPA's reasons for waiting until then to file it, are not apparent.  The following day, plaintiff submitted a 26-page Memorandum of Law in support of its request for TRO.  In response to an inquiry by counsel and consistent with the emergency nature of the relief requested by plaintiff, the Court entered an accelerated briefing schedule resulting in MAWSS filing an Opposition Brief (doc. 30) on October 22, 2007, with MCWSFPA filing a Reply (doc. 31) on October 23, 2007.  Contemporaneously with its reply, MCWSFPA filed a Motion for Preliminary Injunction (doc. 32) that merely piggybacked on the Application for TRO.  MAWSS filed an Opposition Brief (doc. 33) to that Motion on October 24, 2007.[2]  Plaintiff filed a Reply (doc. 34) on October 25, 2007.  Briefing having now been concluded, the Court will now consider the Application for TRO and corresponding Motion

---

[2] In its Opposition Brief, MAWSS asserted that the requested preliminary injunction relief was broader in scope than that requested by the Application for TRO.  This is not correct.  Side-by-side comparison of the relief sought by the Application for TRO and that sought by the Motion for Preliminary Injunction reveals that they are co-extensive, except that of course the TRO would be temporary while the Preliminary Injunction would remain in place until a final ruling on the merits.  *Compare* doc. 28, ¶ 66 *with* doc. 32, ¶¶ 2-4.

for Preliminary Injunction.[3]

## II. Legal Standard for TRO / Preliminary Injunction.

To be eligible for temporary restraining or preliminary injunctive relief under Rule 65, a movant must establish each of the following elements: (1) that there is a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that entry of the relief would serve the public interest. *See KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1268 (11th Cir. 2006); *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225-26 (11th Cir. 2005). The law is clear, moreover, that "[a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion as to each of the four prerequisites." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (internal citations and quotation marks omitted). "Preliminary injunction decisions, about the viability of a plaintiff's claims and the balancing of equities and the public interest, are the district court's to make, and [the Eleventh Circuit] will not set them aside unless the district court has abused its discretion in making them." *Charles H. Wesley Educ. Foundation, Inc. v. Cox*, 408 F.3d 1349, 1354 (11th Cir. 2005) (internal citations and quotation marks omitted); *see also Siegel*, 234 F.3d at 1175 (recognizing that appellate court could reverse denial of preliminary injunction "only if there was a *clear* abuse of discretion").

---

[3] The Court takes these matters under submission without an evidentiary hearing. The law is clear that a hearing is required on motions for TRO or preliminary injunction only if there are contested issues of fact that require credibility determinations. *See Four Seasons Hotels and Resorts, B.V. v. Consorcio Barr, S.A.*, 320 F.3d 1205, 1211 (11th Cir. 2003) (observing that an "evidentiary hearing is not always required before the issuance of a preliminary injunction" unless "facts are bitterly contested and credibility determinations must be made to decide whether injunctive relief should issue") (citations omitted); *Cumulus Media, Inc. v. Clear Channel Communications, Inc.*, 304 F.3d 1167, 1178 (11th Cir. 2002) (opining that where little dispute exists as to raw facts, and dispute revolves around inferences to be drawn from such facts, it is left to district court's sound discretion to determine whether an evidentiary hearing is necessary by balancing the interests of speed and practicality against those of accuracy and fairness). Review of the parties' submissions reveals no <u>material</u> disputes as to raw facts and no bitter contest of facts that must be resolved antecedent to a ruling on the Rule 65 motions; rather, it appears that plaintiff's motions turn on purely legal questions relating to the sufficiency of its evidentiary submission. Accordingly, the Court finds, after balancing the interests of speed and practicality against those of accuracy and fairness, that no hearing is needed here.

**III.     Analysis.**

   *A.     Likelihood of Success on the Merits.*

In both the TRO and the preliminary injunction contexts, a movant must show a substantial likelihood of success on the merits. *See Cable Holdings of Battlefield, Inc. v. Cooke*, 764 F.2d 1466, 1474 (11th Cir. 1985). After careful review of the parties' written submissions, the undersigned finds that MCWSFPA has failed to meet its burden of persuasion on this prerequisite to the issuance of temporary or preliminary injunctive relief. To be sure, plaintiff has argued that all four elements of an illegal *per se* tying claim are satisfied.[4] In response, defendant has failed effectively to challenge plaintiff's proof or arguments on any of those elements, but has simply offered a blanket rebuttal that the cases cited by plaintiff are all factually or procedurally distinguishable. Such a vague argument neither defeats nor seriously calls into question plaintiff's arguments that each of those four elements of proof of a tying scheme are substantially likely to be satisfied here.[5]

---

[4]     Those four basic elements are as follows: "1) that there are two separate products, a 'tying' product and a 'tied' product; 2) that those products are in fact 'tied' together - that is, the buyer was forced to buy the tied product to get the tying product; 3) that the seller possesses sufficient economic power in the tying product market to coerce buyer acceptance of the tied product; and 4) involvement of a 'not insubstantial' amount of interstate commerce in the market of the tied product." *Thompson v. Metropolitan Multi-List, Inc.*, 934 F.2d 1566, 1574 (11th Cir. 1991) (citation omitted).

[5]     That said, MCWSFPA's showing on the coercion prong of the *per se* tying claim appears inadequate to carry its burden. The Eleventh Circuit has specifically looked to and required evidence of actual coercion of customers being actually forced to change their purchasing patterns to select the tied product (*i.e.*, evidence concerning whether the customers would have purchased the tied product anyway). *See Thompson*, 934 F.2d at 1577-78 (denying summary judgment to defendant on antitrust claims where plaintiff proffered substantial evidence that individuals had quit or refused to join plaintiff's professional association because of tying behavior from defendant). MCWSFPA has submitted no evidence of actual coercion of customers (*i.e.*, that any specific customer who would have bought water from MCWSFPA was compelled to buy it from MAWSS instead because of the latter's hardball tying tactics). Instead, plaintiff simply argues that *Thompson* (which plaintiff does not mention by name in this section of its brief, but which is presumably the case to which plaintiff is referring) was wrongly decided in this regard, given the statements in a leading treatise on antitrust law that a party's mere announcement of a tying condition to a buyer is sufficient to establish coercion. *See* X Phillip E. Areeda *et al.*, X *Antitrust Law*, § 1754e (2nd ed. 2003). Of course, the Court does not have the

In lieu of any argument that the elements of a *per se* tying claim cannot be met in this case, MAWSS principally relies on an affirmative defense to federal antitrust liability known as the "state action immunity" doctrine. "Under the state action immunity doctrine, also known as the *Parker* doctrine, states are immune from federal antitrust law for their actions as sovereign." *Crosby v. Hospital Authority of Valdosta and Lowndes County*, 93 F.3d 1515, 1521 (11th Cir. 1996). A political subdivision "is entitled to state action immunity if it acted pursuant to clearly articulated and affirmatively expressed state policy." *Id.* at 1521-22 (citing *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 46-47, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985)); *see also Bankers Ins. Co. v. Florida Residential Property and Cas. Joint Underwriting Ass'n*, 137 F.3d 1293, 1296 (11th Cir. 1998) ("political subdivisions such as municipalities are immune from antitrust liability if their anti-competitive acts follow a 'clearly articulated and affirmatively expressed state policy'") (citation omitted); *TEC Cogeneration Inc. v. Florida Power & Light Co.*, 76 F.3d 1560, 1567 (11th Cir. 1996) ("federal antitrust laws were not intended to reach state-regulated anticompetitive activities").

There appears to be no challenge by MCWSFPA (or at least, none raised in the briefing) that MAWSS qualifies as an instrumentality, agency or political subdivision of Alabama that is eligible for state action immunity; therefore, the Court will refrain from embarking on the fact-intensive analysis required by *Crosby* and other authorities to make that determination, but will instead accept that MAWSS is substantially likely to prevail on that aspect of the defense.[6]

---

luxury of discarding binding precedent in favor of treatises; therefore, plaintiff must satisfy the *Thompson* coercion standard because that decision remains good law in this Circuit. Plaintiff's failure to proffer evidence of actual coercion as required by *Thompson* amounts to a failure to show substantial likelihood of success as to its tying claim.

[6] The focus of that inquiry is whether "the nexus between the State and [MAWSS] is sufficiently strong that, when combined with a clearly articulated policy in favor of the challenged anticompetitive conduct, there is little danger that it is involved in a *private* price fixing arrangement." *Crosby*, 93 F.3d at 1525; *see also Bankers*, 137 F.3d at 1297 ("The more public the entity looks, the less we worry that it represents purely private competitive interests, and the less need there is for active state supervision to ensure that the entity's anticompetitive actions are indeed state actions and not those of an alliance of interests that properly should be competing."). It is apparently undisputed that MAWSS is a Board of Water and Sewer Commissioners organized pursuant to Ala. Code §§ 11-50-340, *et seq.* Those statutes provide, in

Rather, the central battleground exposed in the TRO briefing concerns whether MAWSS can satisfy the "clearly articulated and affirmatively expressed state policy" requirement. At this very preliminary stage, and without the benefit of either comprehensive briefing by the parties or the luxury of time to conduct thorough independent research given the "urgent" nature of the posture in which MCWSFPA has thrust these issues upon the Court, the undersigned deems it substantially likely that MAWSS can make the requisite showing of a clearly articulated policy.

"A state anticompetitive action is pursuant to a clearly articulated policy when the action is *both* authorized by statute *and* its anticompetitive effect is an intended (meaning foreseeable) result of this authorization." *Bankers*, 137 F.3d at 1298; *see also Crosby*, 93 F.3d at 1532 (political subdivision is eligible for state action immunity if it shows "that, through statutes, the state generally authorizes [it] to perform the challenged action; and ... that, through statutes, the state has clearly articulated a state policy authorizing anticompetitive conduct"). MAWSS argues that it can satisfy the "clearly articulated policy" requirements by reference to an Alabama statute that specifically authorizes and empowers Boards of Water and Sewer Commissioners "[t]o combine the water system and the sewer system as a single system for the purpose of operation and financing." Ala. Code § 11-50-343(a)(7). On its face, this language, which is to be liberally construed in accordance with § 11-50-357, certainly appears to reflect that the Alabama law legislature has authorized MAWSS to perform the challenged action.[7] As

---

part, that such a Board "shall be deemed to be a public agency or instrumentality exercising public and governmental functions to provide for the public health and welfare." Ala. Code § 11-50-343(a). Although there are numerous factors involved in the "political subdivision" inquiry, MAWSS has at least made a preliminary showing that it satisfies the legal criteria for that designation. There is certainly no indication in the record before the undersigned (and, again, MCWSFPA has not argued) that MAWSS would not properly be classified as a political subdivision of Alabama for state action immunity purposes.

[7] More generally, the Alabama legislature authorized such Boards "[t]o exercise jurisdiction, control and supervision over any water system or sewer system owned, operated or maintained by the board and to make and enforce such rules and regulations for the maintenance and operation of any such system as may, in the judgment of the board, be necessary or desirable for the efficient operation of such system and for accomplishing the purposes of this article." Ala. Code § 11-50-343(a)(9). This section strongly suggests that the Alabama legislature intended to confer broad discretion on Boards of Water and Sewer Commissioners in operating water and sewer systems, which would encompass the discretion to implement an all-or-nothing

to whether § 11-50-343(a)(7) intends anticompetitive effects, there is no requirement that the legislature "state explicitly that it anticipates anticompetitive effects. ... Rather, it simply requires that the anticompetitive conduct be a foreseeable result of the powers granted to the political subdivision." *Crosby*, 93 F.3d at 1532 (internal citations and quotation marks omitted). The foreseeability requirement has been construed liberally. *See Bankers*, 137 F.3d at 1298 (statute providing that political subdivision may provide claims services confers unfettered discretion on that entity, such that it is foreseeable that entity might engage in potentially anticompetitive adjustment and revision of standards and selection criteria); *Crosby*, 93 F.3d at 1532 (this Circuit requires only that anticompetitive conduct be reasonably anticipated, not the inevitable, ordinary, or routine outcome of the statute); *Kern-Tulare Water Dist. v. City of Bakersfield*, 828 F.2d 514, 519-20 (9th Cir. 1987) (where political subdivision was granted authority to buy and sell water rights, it was foreseeable that city would attach a no-resale-allowed condition to water sales).

Based on the foregoing authorities, the Court perceives no persuasive reason why it is not foreseeable from the express grant of authority to combine water and sewer systems as a single system for purposes of operation and financing that MAWSS would implement a "tying" restriction under which it declined to sell sewer services to customers who did not also purchase its water services. Rather than formulating an argument to the contrary, MCWSFPA simply states in its Reply (doc. 31) in the most conclusory of terms that "MAWSS has the duty (and has failed) to demonstrate the clearly articulated statutory scheme authorizing the illegal tying." (Reply, at 5-6.)[8] But MAWSS expressly cited to § 11-50-343(a)(7) as the statutory source of the requisite authorization. In briefing the Application for TRO, plaintiff offers no inkling of why it believes this statute not to satisfy the foreseeability / reasonable anticipation test, and no such shortcoming in the statute is obvious to the Court.[9]

---

policy for water and sewer systems.

[8] *See also* Reply, at 9 ("Again, Defendant offers no evidence of an Alabama authorization of its undisputed antitrust practices.") and 9-10 ("[I]t is MAWSS's burden to show this Court a 'clearly articulated' Alabama Statutory scheme that exempts MAWSS from federal Antitrust Law. MAWSS has failed to do so.").

[9] That is not to say with any finality that no valid counterarguments exist that might refute defendant's position. In fairness to MCWSFPA, the Court recognizes that plaintiff had

Regrettably, the parties elected to continue filing *de facto* unauthorized briefs on the TRO issue well past the clearly defined terminus point of the Court-ordered briefing schedule.  The most recent of those memoranda, filed just before the close of business on October 25, 2007, is styled by plaintiff as "Reply of Mobile County Water Authority to MAWSS' Opposition to Motion for Preliminary Injunction" (doc. 34).  Despite its title, this filing is effectively an unauthorized reply to MAWSS' unauthorized sur-reply on the Application for TRO (and thus the fifth ping-ponged brief the parties have collectively filed in the last five business days).[10]  Setting aside this filing's problematic procedural pedigree, and overlooking the general proscription against a movant raising new arguments in a reply brief (much less a sur-sur-reply brief), in this most recent brief plaintiff identifies for the first time an explanation for why it believes that § 11-50-343(a)(7) does not support state action immunity here.  As the Court understands MCWSFPA's position, that section is inadequate because it fails to "clearly articulat[e] the anticompetitive activity of illegal tying arrangements."  (Doc. 34, ¶ 14.)  Apparently, plaintiff would confine the analysis to the literal language of the statute, arguing that the cited Alabama Code section cannot be a "clearly articulated policy" unless it expressly states

---

just 24 hours to prepare its reply brief, so the circumstances were hardly conducive to expansive treatment of the issues.  However, this is a dilemma of plaintiff's own creation because it is plaintiff who elected to present this issue to the Court for preliminary resolution in the pressure-packed, time-sensitive, unforgiving crucible of an Application for TRO, rather than limiting itself to a request for preliminary injunction or awaiting an opportunity for more reasoned reflection, research and analysis on summary judgment.

[10]  The cavalcade of unauthorized sur-replies began with MAWSS's "Opposition to Plaintiff's Motion for Issuance of Preliminary Injunction" (doc. 33) filed on October 24, 2007, which proceeded for two paragraphs to discuss the Motion for Preliminary Injunction before stating, "MAWSS would also like to take this opportunity to respond to some of the argument asserted in MCWSFPA's reply in support of its TRO application, (Doc. 31), since it has now been given the opportunity to do so." (Doc. 33, ¶ 3.)  It is unclear what this "opportunity" is.  Certainly this Court did not afford defendant any such opportunity.  Sur-replies can only be filed with leave of court and are ordinarily stricken if no such leave is requested or received.  Neither side adhered to this requirement before submitting their additional memoranda.  The result is particularly burdensome in this case, where the Court is attempting to resolve expeditiously matters that have been characterized as "urgent" by the movant, even as the parties have submitted ever-shifting briefs altering the landscape and analysis on the fly.  Nonetheless, the Court in its discretion will consider these improperly filed memoranda.

that Boards may engage in anticompetitive, otherwise illegal tying arrangements. Plaintiff misapprehends the applicable legal standard. As discussed *supra*, the Eleventh Circuit has unequivocally explained that nothing more is required than that "anticompetitive conduct be a foreseeable result of the powers granted to the political subdivision." *Crosby*, 93 F.3d at 1532. For the reasons stated above, the undersigned is of the opinion, based on the limited evidence and argument presented to date, that it is substantially likely that MCWSFPA will be able to establish that it is foreseeable and could be reasonably anticipated that a water and sewer board granted statutory authority to combine its water and sewer systems for operation and financial purposes, and further given broad authority to make any operational rules that it sees fit, might exercise that authority to require its customers to subscribe to both systems in the "all-or-nothing" approach that MCWSFPA contends is anticompetitive here.

Based on the foregoing, it appears substantially likely that MAWSS will be able to establish on the merits the affirmative defense of state action immunity, insulating it from all liability under the federal antitrust statutes which animate plaintiff's claims for preliminary relief. For that reason, the Court finds that plaintiff has not met its burden of demonstrating a substantial likelihood of success on the merits.

### B.     *Irreparable Harm.*

Because all four prongs of the Rule 65 inquiry must be satisfied by a movant for a TRO or preliminary injunction, plaintiff's failure to establish a substantial likelihood of success on the merits is itself fatal to its request for immediate injunctive relief. Nonetheless, the Court also perceives significant defects in plaintiff's showing of immediate and irreparable harm which would provide independently sufficient grounds for denying the motion.

The Eleventh Circuit has emphasized that "[a] showing of irreparable injury is the *sine qua non* of injunctive relief" and that "the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper." *Siegel*, 234 F.3d at 1176 (citations omitted). Indeed, it has been observed that the very "purpose of a preliminary injunction is to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." *United States v. State of Alabama*, 791 F.2d 1450, 1459 (11th Cir. 1986).

The court file reflects that MCWSFPA and MAWSS have been engaged in legal

skirmishes for more than two decades concerning MAWSS's alleged transgressions in their overlapping service areas. The instant batch of lawsuits, including the one filed in state court in 2005 and the one filed here in May 2007, is not of recent vintage. By all indications, plaintiff has been aware for quite some time of MAWSS's alleged illegal tying practices that are now sought to be enjoined via TRO. Indeed, the Complaint (doc. 1) filed on May 18, 2007 alleged that "for a number of years, MAWSS has adhered to an all-or-nothing utility policy," (doc. 1, ¶ 15). This is precisely the same policy that MCWSFPA claims is causing it irreparable harm. If MCWSFPA was aware of and perceived the effects of the all-or-nothing policy of which it now complains, then it is extraordinarily difficult to understand why it waited for years before filing this action and, beyond that, waited for five months <u>after</u> filing the instant lawsuit before seeking emergency relief to halt that irreparable harm. Simply put, plaintiff's long history of inaction in the face of actual knowledge of defendant's all-or-nothing policy appears fundamentally incompatible with its present cries of irreparable harm arising from that policy. *See, e.g., Gonannies, Inc. v. Goupair.Com, Inc.*, 464 F. Supp.2d 603, 609 (N.D. Tex. 2006) ("Absent a good explanation, a substantial period of delay militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief.") (citation omitted).[11] Such unexplained delay may "standing alone, ... preclude the granting of preliminary injunctive relief ... because the failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." *Tough Traveler, Ltd. v. Outbound Products*, 60 F.3d 964, 968 (2d Cir. 1995) (internal quotation marks and citations omitted); *Ty, Inc. v. Jones Group, Inc.*, 227 F.3d 891, 903 (7th Cir. 2001) ("Delay in pursuing a preliminary injunction may raise questions

---

[11] *See generally Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185, 1193 (5th Cir. 1975) (affirming denial of temporary injunctive relief where movant, among other things, delayed three months in making its request); *Tough Traveler, Ltd. v. Outbound Prod.*, 60 F.3d 964, 968 (2d Cir. 1995) (vacating preliminary injunction where movant waited four months to seek a preliminary injunction after filing suit); *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) (ten week delay in seeking injunction undercut claim of irreparable harm); *Pharmacia Corp. v. Alcon Laboratories, Inc.*, 201 F. Supp.2d 335, 383 (D.N.J. 2002) (delay of one full year before seeking preliminary relief "knocks the bottom out of any claim of immediate and irreparable harm").

regarding the plaintiff's claim that he or she will face irreparable harm if a preliminary injunction is not entered.").

In a weak attempt to justify the unusual timing of its Application for TRO, plaintiff explains that "[t]he specific circumstances giving rise to the immediacy of the Application for a [TRO] are the construction projects for The Home Depot, the Mobile Infirmary Clinic and Bank Trust" in the Tillman's Corner area of Mobile County. (Application for TRO, ¶ 5.)[12]  Yet MCWSFPA has made no showing that MAWSS's application of its "all-or-nothing" policy with respect to these three developments is any different in kind or degree from what it has been doing all along.  MCSWSFPA refers to these developments as an "unusually large transaction" (doc. 28, at 24), but offers no evidence that this bank branch, office supply store and medical clinic are appreciably larger in scope or contemplated water usage than any of the other numerous commercial and residential developments springing up in the service area at issue over the last few years.  Nor, apparently, are these construction projects themselves of recent origin.

Even setting aside the curiously belated filing of the Application for TRO well into the course of this litigation to enjoin activity that plaintiff has apparently known about for years, it is very difficult to perceive anything approaching irreparable harm here.  Plaintiff's brief argues that without an injunction, it will "continue to lose customers for its product," that it will "lose this opportunity" (presumably referring to the Tillman's Corner three-store development), and that it will "be unable to benefit from both the pecuniary gains and the good will it will provide." (Doc. 28, at 23-24.)  Yet conspicuously absent from plaintiff's filings is any evidence that Office Depot, Mobile Infirmary, or Bank Trust would have signed up for water service from plaintiff in the absence of MAWSS's all-or-nothing policy.  There is no affidavit from representatives of any of those three customers to that effect, nor is there allegation of such in plaintiff's filings. Instead, at most, plaintiff submits the Affidavit of Robert G. Brown, the General Manager of MCWSFPA, who avers that his "understanding is that Office Depot and Bank Trust designed their buildings to hook up to the water service of Mobile County Water Service, and not to a yet-

---

[12] The reference to Home Depot in the TRO Application is apparently a typographical error, as plaintiff's other submissions refer extensively to an Office Depot development, not a Home Depot.

to-be available water service of MAWSS." (Doc. 26, ¶ 30.) But this averment does not come close to showing irreparable harm. Indeed, assuming Brown's murky (and almost certainly hearsay) "understanding" is admissible, it shows nothing more than the unremarkable fact that two customers intended to purchase water from MCWSFPA when they thought that MCWSFPA was the only available option for water service at their location because, as Brown avers, "MAWSS does not have water service available to the three construction sites." (*Id.*, ¶ 17.) Now that MAWSS is voluntarily undergoing the effort and expense of an "elaborate boring project [to] install[] water pipes in order to provide water service at the three construction sites" (*id.*, ¶ 21), the three customers may all prefer MAWSS water service, without regard to defendant's all-or-nothing policy. In other words, these customers may be selecting MAWSS's water not because of any antitrust tying by MAWSS, but because they would prefer that entity's service now that it is being made available in their area.[13] Simply put, of the three Tillman's Corner developments that are ostensibly animating its motions for emergency injunctive relief, plaintiff has not shown that it will lose a single one as a customer because of any illegal tying activities of MAWSS.

Finally, the Court considers Brown's statement in his affidavit that "[u]nchecked, MAWSS' 'all-or-none' policy will result in the <u>eventual</u> financial and actual demise of [plaintiff]." (Brown Aff., ¶ 49 (emphasis added).) To be sufficient for a TRO or preliminary injunction, "the asserted irreparable injury must be neither remote nor speculative, but actual and imminent." *Siegel*, 234 F.3d at 1176 (citations and quotation marks omitted); *see also Church v. City of Huntsville*, 30 F.3d 1332, 1337 (11th Cir. 1994) (party is entitled to injunctive relief only if proves "a real and immediate - as opposed to a merely conjectural or hypothetical - threat of future injury"); *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir. 1992) ("a showing of irreparable harm is insufficient if the harm will occur only in the indefinite future"). The kind of speculative, "someday" harm described by the Brown Affidavit is wholly inadequate in that regard.

---

[13] To the extent that plaintiff is complaining about MAWSS's decision to build water access to those construction sites, those arguments appear far better suited to the claims pending in the state law action than to the antitrust issues being litigated here.

In light of this analysis, it is the opinion of the undersigned that plaintiff has failed to make the requisite showing of irreparable harm to warrant the extraordinary remedy of issuance of a TRO or preliminary injunction.[14]

### IV.    Conclusion.

For all of the foregoing reasons, plaintiff's Application for Temporary Restraining Order (doc. 25) and Motion for Issuance of a Preliminary Injunction (doc. 32) are **denied**.

DONE and ORDERED this 29th day of October, 2007.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE

---

[14]    Plaintiff having failed to satisfy two of the four mandatory prerequisites for temporary or preliminary injunctive relief, no constructive purpose would be served by examining the remaining two elements (the balance of harms and the public interest).